FILED
99 SEP 14 PM 4:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

MIKE HALL,

Plaintiff,

vs.

LABOR READY, INC.,

Defendant.

Civil Action No. 98-S-1360-NE

ENTERED
SEP 14 1999

MEMORANDUM OPINION

This action is before the court on defendant's motion to compel plaintiff to submit his Title VII claims to arbitration, and to stay this litigation pending the outcome of proceedings in the arbitral forum. For the reasons discussed below, the motion is due to be denied.

I. BACKGROUND

Mike Hall is a former employee of Labor Ready, Inc., a company that describes itself as "a leading provider of temporary workers to the construction, landscaping, warehousing[,] and light industrial markets."[1] The company allegedly employs "1500 full time people ... operat[ing] through approximately 315 offices located throughout the United States and Canada."[2]

[1] Affidavit of Linda Keaton, submitted in support of defendant's motion to compel arbitration (Doc. No. 7), at ¶ 3.

[2] *Id.*

Hall began work for defendant as a "customer service representative" in its Huntsville, Alabama, office on January 6, 1997. He alleges that he was subjected to "repeated" acts of sexual harassment by his supervisor, Jennifer Allen.[3] Hall lodged a complaint with his district manager (then Linda Keaton) in March of 1997. No disciplinary action was taken against Ms. Allen, but Hall was transferred to the position of "account representative" in the company's Decatur, Alabama, office.[4]

Hall filed a charge of discrimination with the Equal Employment Opportunity Commission on June 2, 1997. Two days later, Labor Ready's new district manager, Rick Burris, "informed plaintiff that his position in Decatur had been eliminated, and that he would be terminated even though his previous position at the Huntsville location had not been filled. Mr. Burris [also] told plaintiff that the Huntsville location did not do enough business to have an account representative."[5]

Following receipt of notice of his right to sue, Hall instituted this action alleging both sexual harassment and that he was terminated in retaliation for filing a sexual harassment complaint in violation of Title VII of the Civil Rights Act of

[3] Complaint (Doc. No. 1) ¶ 10.

[4] *Id.* ¶¶ 14, 15.

[5] *Id.* ¶ 16.

1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* Labor Ready responded by filing the present motion, seeking an order "compel[ling] plaintiff to submit all claims alleged in his complaint to binding arbitration pursuant to the parties' written contract of employment and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*,"[6] and a stay of these proceedings pending the outcome of such arbitration.[7]

In relevant part, Hall's employment contract contained the following clause:

> Company and Employee agree with each other that any claim of Employee arising out of or relating to this Contract or the breach of this Contract or Employee's employment by the Company, including, without limitation, any claim for compensation due, wrongful termination and any claim alleging discrimination or harassment in any form shall be resolved by binding arbitration. The arbitration shall be administered by the American Arbitration Association under its Commercial Arbitration Rules at the American Arbitration Association Office nearest the place of employment. The award entered by the arbitrator shall be final and binding in all respects and judgment thereon may be entered in any Court having jurisdiction.

(Motion to compel arbitration, Exhibit A(1) at 5, ¶ 24 (emphasis supplied).)

---

[6] Defendant's motion to compel arbitration (Doc. No. 7), at 1.

[7] *See* Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 699 (11th Cir. 1992): "Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration. 9 U.S.C. § 3. If the parties do not proceed to arbitration, the court may compel arbitration. 9 U.S.C. § 4."

## II. DISCUSSION

### A. The Federal Arbitration Act

The United States Arbitration Act of 1925,[8] commonly referred to as the Federal Arbitration Act ("FAA" or "the Act"), which is codified at 9 U.S.C. §§ 1-16,[9] was "designed to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate, ... and place such agreements upon the same footing as other contracts." *Volt Info. Sciences v. Leland Stanford Jr. University*, 489 U.S. 468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488 (1989) (citations and internal quotation marks omitted).[10] The Act's primary substantive provision is found in section 2, providing that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration <u>a controversy thereafter arising out of such contract</u> or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal,

---

[8] United States Arbitration Act of 1925, ch. 213, 43 Stat. 883.

[9] The FAA was reenacted and codified in 1947 as Title 9 of the United States Code. *See* Act July 30, 1947, ch. 392, 61 Stat. 669. *See also* Gilmer v. Interstate/Johnson Lane Corp. 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991).

[10] *See also* H. R. Rep. No. 96, 68th Cong., 1st Sess., at 1-2 (1924):

> The need for the [FAA] arises from an anachronism of our American law. Some centuries ago, because of the jealousy of the English courts for their own jurisdiction, they refused to enforce specific agreements to arbitrate upon the ground that the courts were thereby ousted from their jurisdiction.

> shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis supplied).

Section 3 provides for a stay of judicial proceedings while the parties arbitrate "any issue referable to arbitration under an agreement in writing...." 9 U.S.C. § 3. Additionally, section 4 provides the mechanism by which parties may petition the court to compel arbitration. *See* 9 U.S.C. § 4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218-19, 105 S.Ct. 1238, 1241-42, 84 L.Ed.2d 158 (1985) (holding that, upon motion of a party, district courts must compel arbitration of all claims subject to arbitration under the FAA); *American Express Financial Advisors, Inc. v. Makarenwicz*, 122 F.3d 936, 940 (11th Cir. 1997) (same).

The FAA has been construed as establishing a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

**1. The applicability of the Federal Arbitration Act**

The court's initial task is to determine whether the FAA applies at all; in other words, to become "satisfied that the issue involved in such suit or proceeding is referable to arbitration

under such an agreement...." 9 U.S.C. § 3. That decision begs two questions: first, does the relationship between the parties relate to a transaction "involving commerce"; and, second, are contracts of employment expressly excluded from the ambit of the FAA?

**a. "involving commerce"**

Section 2 of the FAA "makes 'valid, irrevocable, and enforceable' only two types of contracts: those relating to a maritime transaction and those involving commerce." *Bernhardt v. Polygraphic Company of America, Inc.*, 350 U.S. 198, 200, 76 S.Ct. 273, 275, 100 L.Ed.2d 199 (1956). The Supreme Court directs district courts to accord an expansive construction to the phrase "involving commerce." *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 268, 115 S.Ct. 834, 836, 130 L.Ed.2d 753 (1995). Additionally, the Court has construed the words "involving commerce" as being the functional equivalent of "affecting commerce": a phrase that "normally signals Congress' intent to exercise its Commerce Clause powers to the full." *Id.* at 273, 115 S.Ct. at 839; *see also Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1060 (11th Cir. 1998) (Cox and Tjoflat, JJ., concurring) (noting that "[t]he FAA's provisions concerning the

validity of arbitration clauses reach to the edge of Congress's power under the Commerce Clause").

An employer seeking to enforce an arbitration clause in an employment contract may satisfy the FAA's "involving commerce" requirement in one of three ways: by showing that the employee, "while performing his duties under the employment contract was working 'in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce...." *Bernhardt*, 350 U.S. at 201, 76 S.Ct. at 275.

In this case, however, plaintiff has not contested Labor Ready's assertion that his employment contract "evidenc[es] a transaction involving commerce."[11] This court consequently assumes, without deciding, that it does.

**b. "contracts of employment"**

In the process of defining the terms "maritime transactions" and "commerce," section 1 explicitly exempts certain classes of employment contracts from the scope of the FAA, stating as follows:

> "Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty

---

[11] *See, e.g.*, Labor Ready, Inc.'s motion to compel arbitration and stay proceedings (Doc. No. 7) at 2, ¶ 5.

> jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, <u>but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce</u>.

9 U.S.C. § 1 (emphasis supplied). An expansive construction of the emphasized language effectively would exclude <u>all</u> employment contracts from the operation of the FAA.

Despite the age of the Act, the Supreme Court still has not defined the scope of section 1's exclusionary language. Although that issue was mentioned in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Court declined to define the precise ambit of section 1, principally because the arbitration clause at issue in that case was contained in a securities regulation application form, and not in an employment contract.[12]

---

[12] The relevant portion of the Court's decision, wherein it declined to address the applicability of the FAA to contracts of employment, is set out below:

> Section 1 of the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Several *amici curiae* in support of Gilmer argue that that section excludes from the coverage of the FAA <u>all</u> "contracts of employment." Gilmer, however, did not

(continued...)

Justice Stevens criticized the *Gilmer* majority for avoiding the issue of the applicability of the FAA to arbitration clauses contained in contracts of employment. His dissent, joined by Justice Marshall, focused on the legislative history of the FAA:

> The Court, declining to reach the issue for the reason that petitioner never raised it below, nevertheless concludes that "it would be inappropriate to address the scope of the § 1 exclusion because the arbitration clause being enforced here is not contained

[12](...continued)
raise the issue in the courts below, it was not addressed there, and it was not among the questions presented in the petition for certiorari. In any event, it would be inappropriate to address the scope of the § 1 exclusion because the arbitration clause being enforced here is not contained in a contract of employment. The FAA requires that the arbitration clause being enforced be in writing. *See* 9 U.S.C. §§ 2, 3. The record before us does not show, and the parties do not contend, that Gilmer's employment agreement with Interstate contained a written arbitration clause. Rather, the arbitration clause at issue is in Gilmer's securities regulation application, which is a contract with the securities exchanges, not with Interstate. The lower courts addressing the issue uniformly have concluded that the exclusionary clause of § 1 of the FAA is inapplicable to arbitration clauses contained in such registration applications. See, *e.g.*, *Dickstein v. DuPont*, 443 F.2d 783 (CA1 1971); *Malison v. Prudential-Bache Securities, Inc.*, 654 F. Supp. 101, 104 (WDNC 1987); *Legg, Mason & Co. v. Mackall & Coe, Inc.*, 351 F. Supp. 1367 (DC 1972); *Tonetti v. Shirley*, 219 Cal.Rptr. 616, 618, 173 Cal.App.3d 1144 (1985); see also *Stokes v. Merrill Lynch, Pierce, Fenner & Smith*, 523 F.2d 433, 436 (CA6 1975). We implicitly assumed as much in *Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), where we held that the FAA required a former employee of a securities firm to arbitrate his statutory wage claim against his former employer, pursuant to an arbitration clause in his registration application. Unlike the dissent, see *post*, at 1659-1660, we choose to follow the plain language of the FAA and the weight of authority, and we therefore hold that § 1's exclusionary clause does not apply to Gilmer's arbitration agreement. Consequently, we leave for another day the issue raised by *amici curiae*.

*Gilmer*, 500 U.S. at 25 n.2, 111 S.Ct. at 1651 n.2.

in a contract of employment.... Rather, the arbitration clause at issue is in Gilmer's securities regulation application, which is a contract with the securities exchanges, not with Interstate." *Ante*, at 25, n. 2. In my opinion the Court too narrowly construes the scope of the exclusion contained in § 1 of the FAA.

There is little dispute that the primary concern animating the FAA was the perceived need by the business community to overturn the common-law rule that denied specific enforcement of agreements to arbitrate in contracts between business entities. The Act was drafted by a committee of the American Bar Association (ABA), acting upon instructions from the ABA to consider and report upon "the further extension of the principle of commercial arbitration." Report of the Forty-third Annual Meeting of the ABA, 45 A. B. A. Rep. 75 (1920). At the Senate Judiciary Subcommittee hearings on the proposed bill, the chairman of the ABA committee responsible for drafting the bill assured the Senators that the bill "is not intended [to] be an act referring to labor disputes, at all. It is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now that is all there is in this." Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 9 (1923). At the same hearing, Senator Walsh stated:

> "The trouble about the matter is that a great many of these contracts that are entered into are really not [voluntary] things at all. Take an insurance policy; there is a blank in it. You can take that or you can leave it. The agent has no power at all to decide it. Either you can make that contract or you can not make any contract. It is the same with a good many contracts of employment. A man says, 'These are our terms. All right, take it or leave it.' Well, there is nothing for the man to do except to sign it; and then he surrenders his right to have his case tried by

the court, and has to have it tried before a tribunal in which he has no confidence at all." *Ibid.*

Given that the FAA specifically was intended to exclude arbitration agreements between employees and employers, I see no reason to limit this exclusion from coverage to arbitration clauses contained in agreements entitled "Contract of Employment." In this case, the parties conceded at oral argument that Gilmer had no "contract of employment" as such with respondent. Gilmer was, however, required as a condition of his employment to become a registered representative of several stock exchanges, including the New York Stock Exchange (NYSE). Just because his agreement to arbitrate any "dispute, claim or controversy" with his employer that arose out of the employment relationship was contained in his application for registration before the NYSE rather than in a specific contract of employment with his employer, I do not think that Gilmer can be compelled pursuant to the FAA to arbitrate his employment-related dispute. Rather, in my opinion the exclusion in § 1 should be interpreted to cover any agreements by the employee to arbitrate disputes with the employer arising out of the employment relationship, particularly where such agreements to arbitrate are conditions of employment.

My reading of the scope of the exclusion contained in § 1 is supported by early judicial interpretations of the FAA. As of 1956, three Courts of Appeals had held that the FAA's exclusion of "contracts of employment" referred not only to individual contracts of employment, but also collective-bargaining agreements. ...

*Gilmer*, 500 U.S. at 38-40, 111 S.Ct. at 1658-59 (Stevens, J., dissenting) (citations omitted) (emphasis supplied).

This court agrees with Justice Stevens and, as detailed below, finds that a fair review of the FAA's legislative history supports the views expressed in his dissenting opinion.

The original text of the FAA was drafted by the "Committee on Commerce, Trade and Commercial Law" of the American Bar Association.[13] The impetus for the legislation came from those portions of the business and industrial community engaged in interstate and foreign commerce. *See generally* Joseph R. Grodin, *Arbitration of Employment Discrimination Claims: Doctrine and Policy in the Wake of* Gilmer, 14 Hofstra Lab. L.J. 1, 7-8 (1996). The FAA was but one part of "a package of three measures, including a uniform state law and an international treaty, designed to foster commercial arbitration." Matthew W. Finkin, *"Workers' Contracts" Under the United States Arbitration Act: An Essay in Historical Clarification*, 17 Berkeley J. Employment & Lab. L. 282, 283-84 (1996). The report of the ABA committee shows the interlocking purposes of the three proposals, and indicates that each was designed to promote expeditious resolution of disputes between

[13] 45 A.B.A. Rep. 293 (1922); *see also, e.g., Gilmer,* 500 U.S. at 39, 111 S.Ct. at 1659; Matthew W. Finkin, *"Workers' Contracts" Under the United States Arbitration Act: An Essay in Historical Clarification*, 17 Berkeley J. Employment & Lab. L. 282, 283 (1996).

commercial entities, not claims between "business men" and their employees.

> In the opinion of your committee, the adoption of the international treaty, the federal statute and the uniform state statute will put the United States in the forefront of this procedural reform. It will raise the standards of commercial ethics. It will reduce litigation. It will enable business men to settle their disputes expeditiously and economically, and will reduce the congestion in the federal and state courts. In pressing forward this improvement in the law, the Association will align itself with the best economic and commercial thought of the country and will do much to overcome the criticism of the law's delays.

*Id.* (quoting 45 A.B.A. Rep. 295 (1922) (emphasis supplied)).

Nevertheless, significant opposition to the legislation came from Andrew Furuseth, President of the International Seamen's Union (ISU).

> Furuseth was a noted figure in American labor history as the long-time leader of the ISU and in the American Federation of Labor (AFL) until the mid-1930s. He was legislative representative for the AFL from 1894 to 1901 and a close ally of Samuel Gompers. His labor injunction bill, introduced by Senator Shipstead in 1922, stimulated an alternative draft that became the Norris-LaGuardia Act of 1926 against, it might be added, Furuseth's bitter opposition. He spearheaded the Seamen's Union's active legislative agenda, the greatest achievement of which was the LaFollette Seamen's Act of 1915, but which also included a number of other measures including the Jones Act of 1920. In sum, Furuseth was a well-known and respected figure in Congress, having appeared before its committees and having actively lobbied it for more than two decades. In addition, he was vigilant for any measure that might adversely affect workers' rights — especially the rights of seamen.

*Id.* at 284 (footnotes omitted).

Furuseth's opposition prompted W.H.H. Piatt, the Chairman of the ABA Committee responsible for drafting the proposed legislation, to declare in hearings conducted by a subcommittee of the Senate Judiciary Committee that the Act was not intended to apply to disputes between employees and employers "at all." Rather, said Piatt, the Act was devised "purely" for the purpose of allowing "merchants the right ... of sitting down and agreeing with each other as to what their damages are, if they want to do it."

> **Senator Sterling.** Has your attention been called to the letter I received from a constituent of mine, Mr. C.O. Bailey, a lawyer at Sioux Falls?
>
> **Mr. Piatt.** No, sir; but there is another matter I should call to your attention. Since you introduced this bill there has been an objection raised against it that I think should be met here, to wit, the official head, or whatever he is, of that part of the labor union that has to do with the ocean — the seamen —
>
> **Senator Sterling.** Mr. Furuseth?
>
> **Mr. Piatt.** Yes; some such name as that. He has objected to it, and criticized it on the ground that the bill in its present form would affect, in fact compel, arbitration of matters of agreement between the stevedores and their employers. Now, it was not the intention of the bill to have any such effect as that. It was not the intention of this bill to make an industrial arbitration in any sense; and so I suggest that ..., if your honorable committee should feel that there is any danger of that, they should add to the bill the following language, "but nothing herein contained

> shall apply to seamen or any class of workers in interstate or foreign commerce." It is not intended that this shall be an act referring to labor disputes, at all. It is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now, that is all there is in this. Secretary Hoover also wrote in support of the bill and proposed a similar exemption.

*Id.* at 285 (quoting from Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration: Hearings on S. 4213 and S. 4214 Before a Subcomm. of the Senate Comm. on the Judiciary, 67th Cong. 4th Sess. 14 (1923) (emphasis supplied)).

If this court were writing on a clean slate, it would conclude, on the basis of the foregoing legislative history, that Congress did not intend for the FAA to be applied to compel the arbitration of employment disputes. That is not the construction favored by a majority of the circuits, however.

The First, Second, Third, Fifth, Sixth, Seventh, Eighth, and D.C. Circuits have held that the exclusionary language contained in section 1 exempts only those classes of workers who, like seamen and railroad employees, are actually engaged in the physical movement of goods across state or international boundaries. *See, e.g., Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 835-37 (8th Cir. 1997) ("[S]ection 1 applies only to contracts of

employment for those classes of employees that are engaged directly in the movement of interstate commerce.");[14] *Great Western Mortgage Corp. v. Peacock*, 110 F.3d 222, 226 (3rd Cir.) ("[T]he exceptions specified in 9 U.S.C. § 1 refer only to workers actually engaged in interstate commerce.") (citing *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America*, 207 F.2d 450, 452 (3d Cir. 1953) (*en banc*) (Section 1 applies only to workers "who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it")), *cert. denied*, 118 S.Ct. 299 (1997);[15] *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 356-58 (7th Cir.) (Posner, C.J.) (holding that the legislative history of the FAA "supports rather than undermines limiting" section 1's exclusionary language to the employment contracts of workers actually engaged in the transportation of goods in interstate or foreign commerce), *cert. denied*, 118 S.Ct. 295 (1997); *Cole v.*

---

[14] *Patterson* was a case in which the plaintiff (a medical technologist) asserted Title VII gender discrimination and retaliation claims against the corporation that owned the hospital in which she worked. The Eighth Circuit held that "section 1 does not exclude the arbitration agreement between Patterson and Tenet from the coverage of the FAA and that the arbitration agreement is thus enforceable." 113 F.3d at 836-37.

[15] The Third Circuit in *Great Western* affirmed a district court order compelling the plaintiff to submit sexual harassment claims based upon New Jersey law to arbitration, in accordance with an arbitration clause contained in her contract of employment.

*Burns International Security Services*, 105 F.3d 1465, 1470-72 (D.C. Cir. 1997) ("[S]ection 1's exclusion ... covers only those workers actually involved in the 'flow' of commerce, *i.e.*, those workers responsible for the transportation and distribution of goods."); *Rojas v. TK Communications, Inc.*, 87 F.3d 745, 748 (5th Cir. 1996) (Section 1 exempts only employment contracts of workers engaged in the movement of goods in commerce); *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 600-01 (6th Cir. 1995) ("[T]he exclusionary clause of § 1 should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are."); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069 (2d Cir. 1972) (Section 1 applies "only to those actually in the transportation industry"); *Dickstein v. duPont*, 443 F.2d 783, 785 (1st Cir. 1971) (Section 1 is limited to employees "involved in, or closely related to, the actual movement of goods in interstate commerce").

In *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054 (11th Cir. 1998), two members of the Eleventh Circuit panel embraced the position taken by the majority of circuits. The

underlying facts of *Paladino* were similar to the present action in some respects. The plaintiff brought a Title VII action against his former employer, and defendant responded to the suit with a motion to compel arbitration. The motion was based upon the following "consent to arbitration" agreement contained in an employee handbook:

> I recognize that during the course of my employment differences can arise between the Company and me. To that end, <u>the Company and I consent to the settlement by arbitration of any controversy or claim arising out of or relating to my employment or the termination of my employment</u>. Arbitration shall be in accordance with the commercial rules of the American Arbitration Association before a panel of three arbitrators in or near the city where I am principally employed. The Company and I further consent to the jurisdiction of the highest court of original jurisdiction of the state where I am principally employed, and of the United States District Court in the District where the arbitration takes place, for all purposes in connection with the arbitration, including the entry of judgment on any award. <u>The arbitrator is authorized to award damages for breach of contract only, and shall have no authority whatsoever to make an award of other damages</u>.

*Paladino*, 134 F.3d at 1056 (emphasis in original). The district court denied defendant's motion and the Eleventh Circuit affirmed. Former Chief Judge Hatchett based the court's affirmance on alternative grounds: the language of the arbitration clause did not "generally and fairly inform Paladino — a worker who is presumably not trained to decipher legalese — that it covers

statutory claims such as Title VII claims"; and, the agreement "contains language which ... is fundamentally at odds with the purposes of Title VII because it completely proscribes an arbitral award of Title VII damages." 134 F.3d at 1059-60.

Additionally, Chief Judge Hatchett suggested in significant *dictum* that the narrow construction imposed on the exclusionary language of section 1 by a majority of circuits may be "incorrect":

> It is assumed that the exception contained in section 1 of the FAA for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" does not apply to the agreement at issue here. It is best not to decide this issue because it is unclear that the district court fully considered it, and because Paladino failed to adequately develop the record with respect to her actual responsibilities as a Regional Technical Sales Consultant for the Southeastern United States. Although a majority of the circuits that have addressed the section 1 exception have construed it narrowly, *see Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1470-72 (D.C. Cir. 1997) (listing cases and adopting narrow construction of section 1's scope), a considerable body of scholarly opinion suggests that those circuits' view of section 1 is incorrect. *See generally*, Joseph R. Grodin, *Arbitration of Employment Discrimination Claims: Doctrine and Policy in the Wake of Gilmer*, 14 Hofstra Lab. L.J. 1 (1996); Matthew W. Finkin, *"Workers' Contracts" Under the United States Arbitration Act: An Essay in Historical Clarification*, 17 Berkeley J. Emp. & Lab. L. 282 (1996). The issue of section 1's scope was raised, but not decided, in the Supreme Court's *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), decision.

*Paladino*, 134 F.3d at 1056 n.1 (emphasis supplied).

The other members of the *Paladino* panel rejected Chief Judge Hatchett's suggestion, however. Judge Cox filed a concurring opinion, in which Judge Tjoflat joined, holding in pertinent part that:

> the appearance of the arbitration clause in an employment contract does not exempt the clause from the FAA under that Act's first section. All but one of the other circuits to have addressed the issue have held that the FAA § 1's exemption of "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, includes only employees actually engaged in transportation of goods in commerce. ... This construction accords with the statute's text and history. ... Although the district court may not have addressed this issue (we have no opinion in the record to tell us), the issue is presented in this case, and we join these other circuits.
>
> According to the allegations of the complaint — the only facts we have at present — Paladino provided technical support to computer system salespeople. There is no evidence that this required her to move goods in interstate commerce. The employment contract therefore does not fall within § 1's exclusion.

*Paladino*, 134 F.3d at 1060-61 (Cox and Tjoflat, JJ., concurring) (citations omitted) (emphasis supplied). This court accordingly is constrained to hold that the FAA applies to the disputed arbitration clause, and now proceeds to determine whether plaintiff may be compelled under the terms of that agreement to submit his Title VII claims to resolution in an arbitral forum.

**B. The Arbitrability of Title VII Claims Under the FAA**

The Supreme Court first addressed the application of arbitration agreements to Title VII claims in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The plaintiff in *Alexander* was a union member who had been discharged by his employer for allegedly "producing too many defective or unusable parts that had to be scrapped." *Id.* at 38, 94 S.Ct. at 1015. The plaintiff initially filed a grievance under the multi-step grievance procedure prescribed in the collective-bargaining agreement in force between the company and his union.[16] One article of that agreement provided: "The Company and the Union agree that there shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry." *Id.* at 39 & n.2, 94 S.Ct. at 1015 & n.2. Even though the plaintiff was of African-American heritage, he did not assert that his discharge resulted from racial discrimination until the final, pre-arbitration step of the grievance procedure.

"The company rejected all of petitioner's claims, and the grievance proceeded to arbitration. Prior to the arbitration

[16] The first four steps of that procedure involved negotiations between the company on one side, and, the union and employee on the other; if the grievance remained unresolved, however, then it was submitted to compulsory, binding, and final arbitration at the fifth step. *See Alexander*, 415 U.S. at 40 n.3, 94 S.Ct. at 1015 n.3.

hearing, however, petitioner filed a charge of racial discrimination with the Colorado Civil Rights Commission, which referred the complaint to the Equal Employment Opportunity Commission...." *Id.* at 42, 94 S.Ct. at 1016. The arbitrator ruled the company had discharged plaintiff "for just cause," and the EEOC later "determined that there was not reasonable cause to believe that a violation of Title VII ... had occurred." *Id.* at 42-43, 94 S.Ct. at 1017.

The plaintiff then filed suit in district court, alleging his discharge was the result of racial discrimination. The court entered summary judgment in favor of the company because plaintiff's claims were previously submitted to arbitration. 346 F. Supp. 1012 (D. Colo. 1971). The Tenth Circuit affirmed *per curiam.* 466 F.2d 1209 (10th Cir. 1972). The Supreme Court reversed, holding principally that an employee's submission of a discrimination claim to final arbitration under the terms of a collective-bargaining agreement neither foreclosed the employee's statutory right under Title VII to a trial *de novo,* nor divested federal courts of jurisdiction to hear such claims. 415 U.S. at 47-49, 94 S.Ct. at 1023-24.

The most significant aspects of the *Alexander* opinion for present purposes are those passages in which the Court demonstrated a jaundiced view of arbitration as a forum for resolving statutory discrimination claims. In rejecting the company's contention that federal courts should defer to the decisions of arbitrators on discrimination claims,[17] the Court said:

> Respondent's deferral rule is necessarily premised on the assumption that arbitral processes are commensurate with judicial processes and that Congress impliedly intended federal courts to defer to arbitral decisions on Title VII issues. We deem this supposition unlikely.
>
> Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the requirements of enacted legislation. Where the collective-bargaining agreement conflicts with Title VII, the arbitrator must follow the agreement. To be sure, the tension between contractual and statutory objectives may be mitigated where a collective-bargaining agreement contains provisions facially similar to those of Title VII. But other facts may still render arbitral processes comparatively inferior to judicial process in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. ... Parties usually choose an arbitrator because they trust his

[17] The employer contended federal courts must defer if three conditions had been satisfied: "(i) the claim was before the arbitrator; (ii) the collective-bargaining agreement prohibited the form of discrimination charged in the suit under title VII; and (iii) the arbitrator has authority to rule on the claim and to fashion a remedy." *Id.* at 55-56, 94 S.Ct. at 1023.

> knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts.
>
> Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath are often severely limited or unavailable. ... And as this Court has recognized, "[a]rbitrators have no obligation to the court to give their reasons for an award." ... Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts.
>
> . . .
>
> We, think, therefore, that the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully <u>both</u> his remedy under the grievance-arbitration clause of a collective-bargaining agreement <u>and</u> his cause of action under Title VII. The federal court should consider the employee's claim *de novo*. The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate.

*Alexander*, 415 U.S. at 56-60, 94 S.Ct. at 1023-25 (citations omitted) (emphasis added).

A decade after *Alexander*, the Supreme Court began to retreat from the broad pronouncements of that decision. In three cases

decided during the 1980's, the Court held that plaintiffs could waive a judicial forum and jury trial, and be compelled under the FAA to submit federal statutory claims to resolution by arbitration. The first of that trilogy, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 61, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), held that a party "agreeing to arbitrate a statutory claim ... does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum." *Id.* at 628, 105 S.Ct. at 3354. The Court further observed: "Having made the bargain to arbitrate, the party should be held to it unless Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 628, 105 S.Ct. at 3354-55.

Although in *Mitsubishi* the Court was concerned with antitrust claims under the Sherman Act, the Court extended the rationale of that decision to other business-related statutes in two subsequent cases: *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (extending *Mitsubishi* rationale to civil claims under the Racketeer Influenced and Corrupt Organizations Act), and *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104

L.Ed.2d 526 (1989) (extending *Mitsubishi* rationale to Securities Act of 1933).

The Supreme Court marked an even more dramatic divergence from *Alexander* with its decision in *Gilmer, supra.*[18] There, the company hired Gilmer to work as a manager of financial services. The corporation required that Gilmer register as a securities representative with the New York Stock Exchange (NYSE). Under the terms of the NYSE registration application, Gilmer agreed to arbitrate "any dispute, claim or controversy" arising out of his employment or the termination of it. Gilmer ultimately was fired. Believing that his discharge was based on age (he then was 62 years old), Gilmer filed suit alleging a violation of the Age Discrimination in Employment Act. The company responded with a motion to compel arbitration of the claim. The district court relied upon *Alexander* and denied the motion, but the Supreme Court reversed, holding that the motion should have been granted. In so doing, the Court again evidenced a more favorable disposition toward the utilization of arbitration as a forum for resolving statutory claims. For example, the Court stated:

---

[18] As Judge Carnes aptly observed, "[t]he Supreme Court took back in *Gilmer* some of the disparaging things it had said about arbitration in *Alexander*. *See Gilmer*, 500 U.S. at 34 n.5, 111 S.Ct. at 1656 n.5." Brisentine v. Stone & Webster Engineering Corp., 117 F.3d 519, 523 (11th Cir. 1997).

> It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Indeed, in recent years we have held enforceable arbitration agreements relating to claims arising under the Sherman Act, ...; § 10(b) of the Securities Exchange Act of 1934, ...; the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), ...; and § 12(2) of the Securities Act of 1933,.... In these cases we recognized that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." ...

500 U.S. at 26, 111 S.Ct. at 1652 (citations omitted).[19]

---

[19] *See also Gilmer*, 500 U.S. at 30, 111 S.Ct. at 1654, where the Court said:

> In arguing that arbitration is inconsistent with the ADEA, Gilmer ... raises a host of challenges to the adequacy of arbitration procedures. Initially, we note that <u>in our recent arbitration cases we have already rejected most of these arguments as insufficient to preclude arbitration of statutory claims</u>. Such generalized attacks on arbitration "res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants," and as such, they are "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Rodriguez de Quijas*, [490 U.S.] at 481. ... [Emphasis supplied.]

Note the following statement also contained in *Gilmer*:

> The Court in *Alexander v. Gardner-Denver Co.* also expressed the view that arbitration was inferior to the judicial process for resolving statutory claims. 415 U.S. at 57-58. That "mistrust of the arbitral process," however, has been undermined by our recent arbitration decisions. *McMahon*, 482 U.S., at 231-232. "[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-627 (1985).

*Id.* at 34 n.5, 111 S.Ct. at 1656 n.5.

The *Gilmer* Court did observe in one independent clause, pregnant with potential application to the present controversy, that "all statutory claims may not be appropriate for arbitration...." *Id.* at 26, 111 S.Ct. at 1652. Even so, the Court placed the burden squarely upon a plaintiff "to show that Congress intended to preclude a waiver of a judicial forum":

> Although all statutory claims may not be appropriate for arbitration, "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." ... In this regard, we note that the burden is on Gilmer to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims. ... If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an "inherent conflict" between arbitration and the ADEA's underlying purposes. ... Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." ...

*Id.* (citations omitted).[20]

In order to avoid binding arbitration in the present case, therefore, plaintiff must shoulder the *Gilmer* burden: namely, he

---

[20] The *Gilmer* Court noted three distinctions between that case and *Alexander*, which are not of concern here. First, the Court noted *Alexander* did not address the enforceability of an agreement to arbitrate statutory claims, but instead addressed the issue of whether arbitration of discrimination claims based on an anti-discrimination clause in a collective bargaining agreement precluded the subsequent adjudication of a statutory claim. Second, the employee in *Alexander* was represented in arbitration by his union, which might not adequately protect his individual interests. Third, *Alexander* was not decided under the FAA and its liberal policy favoring arbitration.

must show that Congress intended to preclude the submission of Title VII claims to binding arbitration. In brief and during oral argument, plaintiff focused upon the legislative history of the Title VII amendments enacted by the Civil Rights Act of 1991.

The first reference to the subject of "arbitration" was grafted onto the statutory body of Title VII law by § 118 of the Civil Rights Act of 1991, which provided:

> Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, fact finding, minitrials, and arbitration <u>is encouraged</u> to resolve disputes arising under the Acts or provisions of Federal Law amended by this title.

Civil Rights Act of 1991, Pub. L. No. 102-166, § 118, 105 Stat. 1071, 1081 (emphasis supplied) (see note entitled "Alternative Means of Dispute Resolution" following 42 U.S.C.A. § 1981, at 611 (1994)).

The wording of § 118 does not convey a Congressional intent to preclude the waiver of a judicial remedy for the resolution of Title VII claims. Rather, as Judge Carnes observed when reviewing identical language added to the Americans with Disabilities Act in 1990,[21] "[t]he text ... is arbitration friendly. ... Encouragement

---

[21] 42 U.S.C. § 12212 (Pub. L. 101-336, Title V, § 513, adopted July 26, 1990, 104 Stat. 377), providing that "[w]here appropriate and to the extent (continued...)

is towards the other end of the pole from preclusion." *Brisentine v. Sone & Webster Engineering Corp.*, 117 F.3d 519, 523 (11th Cir. 1997). Indeed, most courts have construed the section as indicating Congressional endorsement of arbitration agreements. *See, e.g.*, *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 837 (8th Cir. 1997) ("[T]he arbitrability of Title VII claims finds support in the Civil Rights Act of 1991."); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 881 (4th Cir. 1995) ("The language of the statutes [*i.e.*, § 118 of the Civil Rights Act of 1991 and 42 U.S.C. § 12212 of the ADA] could not be any more clear in showing Congressional favor towards arbitration."); *Lockhart v. A.G. Edwards & Sons, Inc.*, No. 93-2418, 1994 WL 34870 at *4 (D. Kan. Jan. 25, 1994) ("The plain language of [§ 118] specifically endorses the use of arbitration.").

Even so, the scanty references to § 118 that are found in the thin volume of legislative history for the Civil Rights Act of 1991[22] tend to suggest that Congress did not intend to endorse the

---

[21](...continued) authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under this chapter."

Curiously, Congress did not codify § 118 of the Civil Rights Act of 1991 like its identical predecessor added to the ADA the preceding year.

[22] Legislative history for the Civil Rights Act of 1991 is sparse. There (continued...)

practice of inserting arbitration clauses into employment contracts.

For example, the report of the House Education and Labor Committee endorsed the Supreme Court's decision in *Alexander.*[23] In the course of discussing that portion of House Resolution 1 ultimately adopted as § 118 of the Civil Rights Act of 1991 (*i.e.*, § 216 of H. R. 1), the Committee emphasized that "the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII."

> Section 216 encourages the use of alternative means of dispute resolution to resolve disputes arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e *et. seq.*, the Civil Rights Act of 1871, 42 U.S.C. section 1981, or the Age Discrimination in Employment Act, 29 U.S.C. section 621 *et seq.*, where appropriate and to the extent authorized by law. These methods include settlement negotiations, conciliation, facilitation, mediation, factfinding, mini-trials and arbitration. This section is intended to encourage alternative means of dispute resolution that are already authorized by law.
>
> The Committee emphasizes, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration,

---

[22](...continued)
are no Conference Committee Reports and, as discussed in the following text, only two House Committee Reports on House Resolution 1, the House version of the Act.

[23] The report was issued on April 24, 1991, prior to the Supreme Court's decision in *Gilmer*.

> whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner-Denver Co.* 415 U.S. 36 (1974). The committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.

H.R. Rep. No. 40(I), 102nd Cong., 1st Sess. 1991, *reprinted in* 1991 U.S.S.C.A.N. 546, 635 (emphasis supplied).

In addition, the committee distinguished § 216 of House Resolution 1 from House Resolution 1375, a Republican-supported version of the Act that was rejected. The committee's comments in that regard further emphasized that § 118's encouragement of arbitration as an "alternative means" of resolving Title VII disputes should not be misconstrued as Congressional endorsement of clauses requiring workers, as a condition of employment, to agree in advance of a dispute to submit claims to resolution by arbitration.

> H.R. 1 includes a provision encouraging the use of alternative means of dispute resolution to supplement, rather than supplant, the rights and remedies provided by title VII. The Republican substitute, however, encourages the use of such mechanisms "in place of judicial resolution." Thus, under the latter proposal employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints. Such a rule would fly in the face of Supreme Court decisions holding that workers have the right to go

> to court, rather than being forced into compulsory arbitration, to resolve important statutory and constitutional rights, including employment opportunity rights. *See, e.g., Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974); *McDonald v. City of West Branch*, 466 U.S. 284 (1984). American workers should not be forced to choose between their jobs and their civil rights.

*Id.*, *reprinted in* 1991 U.S.S.C.A.N. 546, 642.

The report of the House Judiciary Committee also generally endorsed the Supreme Court's decision in *Alexander*.[24]

> Section 216 encourages the use of alternative means of dispute resolution, where appropriate and to the extent authorized by law. These methods include settlement negotiations, conciliation, facilitation, mediation, factfinding, mini-trials and arbitration.
>
> This amendment was adopted to encourage alternative means of dispute resolution that are already authorized by law. A virtually identical amendment was enacted as part of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.
>
> The Committee emphasizes, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner-Denver Co.* 415 U.S. 36 (1974). The Committee does not intend for the inclusion of this section to be used to preclude rights and remedies that would otherwise be available.

---

[24] The report of the House Judiciary Committee was issued on May 17, 1991, four days after the Supreme Court's decision in *Gilmer*.

H.R. No. 102-40(II), 1991 WL 87020 at 80.

Dissenting members of the House Judiciary Committee entered the following commentary:

> [§ 216] "encourages" the voluntary use of conciliation, mediation, arbitration and other methods for resolving disputes under Civil Rights laws governing employment discrimination.
>
> We agree that voluntary mediation and arbitration are far preferable to prolonged litigation for resolving employment discrimination claims. As Congresswoman Nancy Johnson (R-CT) testified before the Subcommittee on Civil and Constitutional Rights:
>
> > Instead of moving these cases into an already overcrowded and costly court system, we should work to improve the mediation process that has proven itself capable of providing timely and affordable justice. [Experience with] medical malpractice and the liability problems arising from such cases has shown quite clearly that a system bent on forcing claimants to court increases costs, but more notably, denies access to the poor and unsophisticated, and does nothing to improve health care. ...
>
> Unfortunately, this section is nothing but an empty promise to those claimants (and employers) who wish to resolve their disputes without expensive litigation.
>
> We recognize that mediation and arbitration, knowingly and voluntarily undertaken, are preferred methods of settlement of employment discrimination disputes. This provision, however, is an empty promise which in no way will assist claimants or employers in the resolution of such claims.

*Id.*, 1991 WL 87020 at 157-58. Those comments indicate that the Committee's majority did not endorse pre-dispute arbitration

agreements as a means of supplanting a judicial forum for resolving Title VII claims.

Only three members of Congress made floor comments about the language ultimately adopted as § 118 of the Civil Rights Act of 1991, and their views of the legislative intent expressed by those words were as different as the Supreme Court's opinions in *Alexander* and *Gilmer*. Representative Edwards, for example, clearly disapproved of the Court's decision in *Gilmer*, and he contrasted it to the statutory purpose as follows:

> Section 118 encourages the use of alternative dispute resolution mechanisms, such as conciliation and mediation, to resolve disputes arising under Title VII when appropriate and to the extent authorized by law. This proviso is intended to supplement, not supplant, remedies provided by Title VII, and is not to be used to preclude rights and remedies that would otherwise be available. This section is intended to be consistent with decisions such as *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), which protect employees from being required to agree in advance to arbitrate disputes under Title VII and to refrain from exercising their right to seek relief under Title VII itself. This section contemplates the use of voluntary arbitration to resolve specific disputes after they have arisen, not coercive attempts to force employees in advance to forego statutory rights. No approval whatsoever is intended of the Supreme Court's recent decision in *Gilbert [sic] v. Interstate Johnson Lane Corp.*, 111 S.Ct. 1647 (1991), or any application or extension of it to Title VII. This section is virtually identical to section 216 in H.R. 1 as previously passed by the House in this Congress and as explained in H.R. Rep. No. 102-40, 102 Cong., 1st Sess. 97 (1991).

137 Cong. Rec. H9505-01, H9530 (emphasis supplied).

Representative Hyde and Senator Dole, on the other hand, evidenced favorable views of the *Gilmer* decision in identical remarks recorded in the journals of his respective chamber.

> This provision encourages the use of alternative means of dispute resolution, including binding arbitration, where the parties knowingly and voluntarily elect to use these methods.
>
> In light of the litigation crisis facing this country and the increasing sophistication and reliability of alternatives to litigation, there is no reason to disfavor the use of such forums. *See Gilmer v. Interstate/Johnson Lane Corp.*, 111 S.Ct. 1647 (1991).

137 Cong. Rec. H9505-01, H9548 (Rep. Hyde); 137 Cong. Rec. S15472-01, S15478 (Sen. Dole).

Due to the limited supporting legislative history, this court concludes that plaintiff has failed to show that Congress intended to preclude Title VII claims from binding arbitration. Only Representative Edwards made comments critical of such agreements. However, the lone statement of one Congressman does not satisfy plaintiff's burden. Moreover, "remarks made by individual members of Congress during floor debates typically serve as the least reliable form of legislative history since they not only brim with obvious bias but also remain subject to continuous amendment and supplementation throughout the legislative process." *Johnson v.*

*Hubbard Broadcasting, Inc.*, 940 F. Supp. 1447, 1457-58 (D. Minn. 1996).

The most persuasive evidence of Congressional antipathy to pre-dispute arbitration agreements is found in that portion of the House Labor and Education Committee Report condemning the Republican substitute proposal (House Resolution 1375), under which:

> employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints. Such a rule would fly in the face of Supreme Court decisions holding that workers have the right to go to court, rather than being forced into compulsory arbitration, to resolve important statutory and constitutional rights, including employment opportunity rights. *See, e.g., Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974); *McDonald v. City of West Branch*, 466 U.S. 284 (1984). American workers should not be forced to choose between their jobs and their civil rights.

H.R. Rep. No. 40(I), 102nd Cong., 1st Sess. 1991, *reprinted in* 1991 U.S.S.C.A.N. 546, 642.

Again, however, this court is "unpersuaded that [one] paragraph from a committee report is sufficient to establish Congressional intent to preclude a waiver of a judicial remedy in Title VII cases." *Lockhart v. A.G. Edwards & Sons, Inc.*, No. 93-2418, 1994 WL 34870 at *4 (D. Kan. Jan. 25, 1994). Moreover, the statement is at odds with the wording of § 118, encouraging the use

of "alternative means"[25] of dispute resolution, "including ... arbitration," to resolve Title VII claims. *See Cremin v. Merrill Lynch Pierce Fenner & Smith*, 957 F. Supp. 1460, 1474 (N.D. Ill. 1997) ("[T]he House Report flouted § 118's express language favoring arbitration.").

Furthermore, Eleventh Circuit cases decided after *Gilmer* have generally assumed that plaintiffs may be compelled to abandon a judicial forum for the resolution of statutory discrimination claims, provided the arbitration clause at issue satisfies certain prerequisites.

The first Eleventh Circuit opinion to address the impact of *Gilmer* upon the arbitrability of statutory claims was *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698 (11th Cir. 1992). There, the plaintiff alleged a Title VII sexual harassment claim against her supervisor and the stock brokerage firm that employed both of them. Like the plaintiff in *Gilmer*, the plaintiff in *Bender* had signed a "Uniform Application for Securities Industry Registration" form, otherwise known as a "U-4 Application." Plaintiff thereby had agreed to "arbitrate any dispute, claim or controversy that may

---

[25] *See* Bryan A. Garner, A Dictionary of Modern Legal Usage 47 (2d ed. 1995) (defining the word "alternative," when used as an adjective, to mean "mutually exclusive; available in place of another").

arise between me and my firm, or a customer or any other person that is required to be arbitrated under the rules, constitutions or by-laws of the organizations with which I register." *Id.* at 700 & n.1. Even so, the district court refused to stay the action pending arbitration, "finding that Bender could not waive her right to a federal adjudication of Title VII claims." *Id.* at 699. The Eleventh Circuit reversed in a *per curiam* opinion saying that, like the plaintiff in *Gilmer*, "Bender has not waived her right to a forum, for she can pursue her claims in arbitration, and if the arbitration proceedings are somehow legally deficient, she may return to federal court for review." *Id.* at 700 (citation omitted).

The next Eleventh Circuit decision to address the arbitrability of statutory claims was *Kidd v. Equitable Life Assurance Society of the United States*, 32 F.3d 516 (11th Cir. 1994). Both plaintiffs in *Kidd*, "present and former securities sales agents with Equitable," had completed "U-4 Applications" issued by the National Association of Securities Dealers ("NASD"). *Id.* at 517. One provision required the applicant to submit to arbitration "any dispute, claim or controversy between me and my firm ... that is required to be arbitrated under the rules,

constitutions or bylaws of the [NASD]." *Id.* Thus, when plaintiffs sued Equitable for race discrimination in violation of Title VII, the company moved to compel them to submit their claims to arbitration. The district court denied the motion, but the Eleventh Circuit reversed, holding, without edifying discussion,[26] that the NASD code required arbitration of employment disputes between NASD members and their registered sales representatives.

The third Eleventh Circuit case to address the arbitrability of statutory claims was *Brisentine v. Stone & Webster Engineering Corp.*, 117 F.3d 519 (11th Cir. 1997). The plaintiff there was a member of the International Brotherhood of Electrical Workers who had been terminated from a position at TVA's Browns Ferry Nuclear Plant by Stone & Webster due to work restrictions imposed by a physician who had performed surgery on plaintiff's back. *Id.* at 521. He filed suit alleging a violation of the Americans with Disabilities Act. The district court granted summary judgment in

[26] The focus of discussion in *Kidd* was on plaintiffs' contention that the amended NASD code which became effective subsequent to the date plaintiffs had executed U-4 agreements — and which clearly required the arbitration of employment disputes between NASD members, such as Equitable, and registered sales representatives employed by the member — did not apply to their Title VII claims. 32 F.3d at 518 & n.4. The Eleventh Circuit, in effect, held that was a moot issue, because even the pre-amendment NASD code required arbitration of employment disputes. The opinion did not directly address any of the issues before this court. Rather, it simply assumed, without discussion, that the employer could compel the arbitration of Title VII claims under the terms of such clauses.

favor of Stone & Webster, because the plaintiff had failed to file a grievance and submit that grievance to binding arbitration, in accordance with the terms of a collective bargaining agreement between contractors performing work for TVA at its Browns Ferry nuclear facility and the unions comprising the Tennessee Valley Trades and Labor Council. *See id.* at 520-21. The Eleventh Circuit reversed, stating:

> [A] mandatory arbitration clause does not bar litigation of a federal statutory claim, unless three requirements are met. First, the employee must have agreed individually to the contract containing the arbitration clause — the union having agreed for the employee does not count. Second, the agreement must authorize the arbitrator to resolve federal statutory claims — it is not enough that the arbitrator can resolve contract claims, even if factual issues arising from those claims overlap with the statutory claim issues. Third, the agreement must give the employee the right to insist on arbitration if the federal statutory claim is not resolved to his satisfaction in any grievance process. All three of those requirements were met in the *Gilmer* case.... None of the requirements were met in this case.

*Id.* at 526-27.

The Eleventh Circuit next addressed the arbitrability of statutory claims in *Paladino*. As previously discussed, the binding precedential value of *Paladino* is found in the special concurrence of Judges Cox and Tjoflat. Although the panel majority held that the wording of the arbitration clause at issue encompassed the

plaintiff's Title VII claims, the court nevertheless held the agreement unenforceable for two, independent reasons: first, it deprived the plaintiff of Title VII damages that would be available to her in a judicial forum (*e.g.*, back pay, reinstatement, attorneys' fees) and thereby defeated the remedial purposes of the statute;[27] and, second, as a result of not specifying that the employer would pay the costs of an arbitral forum, the clause thereby shifted "at least half the hefty cost of an arbitration" and "steep filing fees" to the plaintiff.

> Two provisions of the arbitration clause here describe arbitral claims and available remedies. The first unambiguously includes all claims: it extends the clause to "any controversy or claim arising out of or relating to my employment or the termination of my employment." "Any" is not ambiguous, and if any claim "aris[es] out of ... termination," it is a Title VII gender-discrimination claim. This provision makes Title VII claims arbitrable, as this circuit has held for language that is materially similar. *See Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 700 n.1 (11th Cir. 1992) (Title VII claim included in "any dispute, claim or controversy that may arise between me and my firm").
>
> The second relevant provision, however, just as plainly circumscribes the arbitrator's authority to grant relief. That provision divests the arbitrator of jurisdiction to award any relief in a Title VII action: "The arbitrator is authorized to award damages for breach of contract only, and shall have no authority whatsoever to make an award of other damages." Title VII actions are, of course, not contractual. *See Alexander v.*

[27] In this respect, Judges Cox and Tjoflat agreed with Chief Judge Hatchett, the third member of the panel.

*Gardner-Denver Co.*, 415 U.S. 36, 49, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974). Thus, if an arbitrator were to award Paladino classic Title VII relief such as back pay or reinstatement, a court applying the FAA could vacate the award. *See* 9 U.S.C. § 10(a)(4); *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250 (7th Cir. 1994) (affirming vacatur of award of damages outside the scope of the arbitration agreement).

. . .

Federal statutory claims are generally arbitrable because arbitration, like litigation, can serve a remedial and deterrent function, and federal law favors arbitration. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28, 111 S.Ct. 1647, 1653, 114 L.Ed.2d 26 (1991). Title VII claims are no exception to this rule. *See Bender*, 971 F.2d at 700. But the arbitrability of such claims rests on the assumption that the arbitration clause permits relief equivalent to court remedies. *See Gilmer*, 500 U.S. at 28, 111 S.Ct. at 1653. When an arbitration clause has provisions that defeat the remedial purpose of the statute, therefore, the arbitration clause is not enforceable. *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1468 (D.C. Cir. 1997).

This clause defeats the statute's remedial purposes because it insulates Avnet from Title VII damages and equitable relief. *Cf. Brisentine v. Stone & Webster Eng'g Corp.*, 117 F.3d 519, 526-27 (11th Cir. 1997) (listing as one of the factors rendering a collective-bargaining arbitration clause unenforceable the arbitrator's lack of authority to resolve statutory claims). Arguably, Paladino could hope for a finding of liability from the arbitrator. In that event, she would still have to repair to a judicial forum to pursue any Title VII remedy. These difficulties considered, we treat this clause as an impermissible waiver of Title VII rights. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51-52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974); *Schwartz v. Florida Bd. of Regents*, 807 F.2d 901, 906 (11th Cir. 1987).

> The difficulty of obtaining meaningful relief is not, moreover, the only infirmity of this clause. Because Avnet makes no promises to pay for an arbitrator, employees may be liable for at least half the hefty cost of an arbitration and must, according to the American Arbitration Association rules the clause explicitly adopts, pay steep filing fees (in this case $2000). One circuit has in dicta stated that such "fee-shifting" is a per se basis for nonenforcement. *Cole*, 105 F.3d at 1484. We consider costs of this magnitude a legitimate basis for a conclusion that the clause does not comport with statutory policy.
>
> Arbitration ordinarily brings hardships for litigants along with potential efficiency. Arbitral litigants often lack discovery, evidentiary rules, a jury, and any meaningful right to further review. In light of a strong federal policy favoring arbitration, these inherent weaknesses should not make an arbitration clause unenforceable. *See Gilmer*, 500 U.S. at 30-31, 111 S.Ct. at 1654-55 (listing disadvantages of arbitration that do not prevent its use). *But see Cole*, 105 F.3d at 1482 (taking lack of discovery into account to determine enforceability). But a clause such as this one that deprives an employee of any hope of meaningful relief, while imposing high costs on the employee, undermines the policies that support Title VII. It is not enforceable.

*Paladino*, 134 F.3d at 1061-62 (emphasis added) (footnote omitted).

The Eleventh Circuit's most recent decision on the arbitrability of statutory claims was issued in *Randolph v. Green Tree Financial Corp.*, 178 F.3d 1149 (11th Cir. 1999). In that case, the purchaser of a mobile home sued the lending agency that financed the purchase, asserting claims under the Truth in Lending Act and the Equal Credit Opportunity Act. The purchaser's retail

installment contract contained an arbitration clause providing that:

> [a]ll disputes, claims, or controversies arising from or relating to this Contract or the relationships which result from this Contract ... be resolved by binding arbitration by one arbitrator selected by Assignee [Green Tree] with consent of Buyer(s). This arbitration Contract is made pursuant to a transaction in interstate commerce, and shall be governed by the Federal Arbitration Act at 9 U.S.C. Section 1. Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes. The parties understand that they have a right or opportunity to litigate disputes through a court, but that they prefer to resolve their disputes through arbitration, except as provided herein. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL EITHER PURSUANT TO ARBITRATION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY ASSIGNEE [Green Tree] (AS PROVIDED HEREIN). The parties agree and understand that all disputes arising under case law, statutory law, and all other laws including, but not limited to, all contract, tort, and property disputes will be subject to binding arbitration in accord with this Contract. The parties agree and understand that the arbitrator shall have all powers provided by the law and the Contract ... [including] money damages, declaratory relief, and injunctive relief. Notwithstanding anything hereunto [*sic*] the contrary, Assignee [Green Tree] retains an option to use judicial or non-judicial relief to enforce a security agreement relating to the Manufactured Home secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation secured by the Manufactured Home or to foreclose on the Manufactured Home.... The initiation and maintenance of an action for judicial relief in a court [on the foregoing terms] shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration in this Contract, including the filing of a

> counterclaim in a suit brought by Assignee pursuant to this provision.

Id. at 1151. The district court granted Green Tree's motion to compel plaintiff to submit her federal statutory claims to binding arbitration. The Eleventh Circuit reversed, saying:

> The arbitration clause in this case raises serious concerns with respect to filing fees, arbitrators' costs and other arbitration expenses that may curtail or bar a plaintiff's access to the arbitral forum, and thus falls within our holding in *Paladino*. This clause says nothing about the payment of filing fees or the apportionment of the costs of arbitration. It neither assigns an initial responsibility for filing fees or arbitrators' costs, nor provides for a waiver in cases of financial hardship. It does not say whether consumers, if they prevail, will nonetheless be saddled with fees and costs in excess of any award. It does not say whether the rules of the American Arbitration Association, which provide at least some guidelines concerning filing fees and arbitration costs, apply to the proceeding, whether some other set of rules applies, or whether the parties must negotiate their own set of rules.
>
> . . .
>
> Accordingly, we conclude that the arbitration clause in this case is unenforceable, because it fails to provide the minimum guarantees required to ensure that Randolph's ability to vindicate her statutory rights will not be undone by steep filing fees, steep arbitrators' fees, or other high costs of arbitration. *See Paladino*, 134 F.3d at 1062 ("When an arbitration clause has provisions that defeat the remedial purpose of the statute, ... the arbitration clause is not enforceable." (citation omitted)).

*Id.* at 1158.

In accordance with guidelines established by binding precedent, this court finds the arbitration clause at issue to be unenforceable. Even though the clause "authorize[s] the arbitrator to resolve federal statutory claims," *Brisentine*, 117 F.3d at 527, and is far more specific than the clauses examined in either *Bender* or *Paladino*,[28] it nevertheless fails to pass scrutiny, because it insufficiently details which party will bear the costs of arbitration and, thus, potentially limits plaintiff's access to the arbitral forum.

> Because [Labor Ready] makes no promises to pay for an arbitrator, [the plaintiff] may be liable for at least half the hefty cost of an arbitration and must, according to the American Arbitration Association rules the clause explicitly adopts, pay steep filing fees (in this case $2000).[[29]] One circuit has in dicta stated that such "fee-shifting" is a per se basis for nonenforcement. *Cole*, 105 F.3d at 1484. We consider costs of this magnitude a legitimate basis for a conclusion that the clause does not comport with statutory policy.

*Paladino*, 134 F.3d at 1062 (Cox & Tjoflat, JJ., concurring).

[28] The clause in Hall's contract of employment applies by its terms not only to "any claim" arising out of his employment, but also specifically to claims for "wrongful termination and ... discrimination or harassment in any form."

[29] Neither the complaint filed in the present action (see Doc. No. 1, ¶¶ 22, 24-27), nor that filed in *Paladino* sought a specific amount of monetary damages. Accordingly, "such claims incur a $2000 filing fee. AAA Commercial Arbitration Rules Fee Schedule." *Paladino*, 134 F.3d at 1062 n.2 (Cox & Tjoflat, JJ., concurring).

III. CONCLUSION

Based upon the foregoing discussion, this court concludes as follows. First, the court assumes plaintiff's employment contract "evidenc[es] a transaction involving commerce." 9 U.S.C. § 2. Second, the court is constrained by binding authority to hold that the exclusionary language of 9 U.S.C. § 1 exempts from the scope of the FAA only the employment contracts of those persons actually involved in the physical movement of goods and commodities in interstate or foreign commerce. *Paladino*, 134 F.3d at 1060-61 (Cox and Tjoflat, JJ., concurring). Third, the court finds that plaintiff failed to carry his burden of demonstrating that "Congress intended to preclude a waiver of a judicial forum for [Title VII] claims." *Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652. Fourth, unlike the plaintiff in *Alexander*, the plaintiff here "agreed individually to the contract containing the arbitration clause." *Brisentine*, 117 F.3d at 526. Finally, however, the subject clause is not enforceable under *Paladino* and *Randolph*, because "it fails to provide the minimum guarantees required to ensure that [plaintiff's] ability to vindicate [his] statutory rights will not be undone by steep filing fees, steep arbitrators'

fees, or other high costs of arbitration." *Randolph*, 178 F.3d at 1158.

An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 14th day of September, 1999.

United States District Judge